## JOHNSON v. GARNER.

(District Court, D. Nevada.  June 16, 1916.)

### No. A-17.

1. STATUTES ⬦226—CONSTRUCTION—STATUTE ADOPTED FROM OTHER STATE.
   Where the Legislature of one state adopts a statute already in force in another state, it is presumed that the construction given such statute is also adopted.
   [Ed. Note.—For other cases, see Statutes, Cent. Dig. § 307; Dec. Dig. ⬦226.]

2. HUSBAND AND WIFE ⬦272(1)—COMMUNITY PROPERTY—DIVORCE.
   The Nevada Constitution adopted in 1864 defines, in article 4, § 31, what shall constitute the separate property of the wife, and provides that laws shall be passed more clearly defining the rights of the wife to the community as well as to her separate property. Thereafter was enacted St. Nev. 1864-65, c. 76, § 12, declaring that, in case of dissolution of the marriage by decree of any court of competent jurisdiction, the common property shall be equally divided between the parties, and the court granting the decree shall make such order for the division of the

⬦For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

common property as the nature of the case may require, provided that, when the decree is rendered on the ground of adultery or extreme cruelty, the party found guilty shall be entitled to such portion of the common property as the court granting the decree may deem just and allow. In 1873 this act was repealed, but section 12 was continued, and now appears as Rev. Laws Nev. § 2166, declaring that, in case of the dissolution of the marriage, the community property must be equally divided between the parties, and the court granting the decree must make such order for the division of the community property as the nature of the case may require, while that portion of the act of 1873 appearing as section 2188 declares that the rights of husband and wife are governed by the act, unless there is a marriage contract or settlement. Rev. Laws Nev. § 5841, enacted in 1861, declares that in granting a divorce the court shall make such disposition of the property of the parties as shall seem just and equitable for the benefit of the children, and that all property and pecuniary rights and interests, and all rights touching the children, their custody and guardianship, not otherwise disposed of, shall, by such divorce, be divested out of the guilty party, and vested in the party at whose instance the divorce was granted. *Held*, in view of another section of the same act appearing as Rev. Laws Nev. § 5843, and declaring that when the marriage shall be dissolved by the husband being sentenced to imprisonment, and when a divorce shall be ordered for the cause of adultery committed by the husband, the wife shall be entitled to the same proportion of his lands and property as if he were dead; but in other cases the court shall set apart such portion for her support and the support of their children as shall be deemed just, and, as the act of 1861 was passed before the creation of community property, effect cannot be given to it, particularly in view of the construction by the California courts of the later statutes, which must be deemed to have been adopted when the statutes were adopted from that state; hence a decree of divorce in favor of the husband for desertion does not, though there was no adjudication as to property rights, deprive the wife of her rights in the community property.

[Ed. Note.—For other cases, see Husband and Wife, Cent. Dig. § 1003; Dec. Dig. ☞272(1).]

3. HUSBAND AND WIFE ☞272(1)—COMMUNITY PROPERTY—DIVORCE.

A divorce terminates the community estate of the spouses, and thereafter they are tenants in common of such community property, rather than copartners.

[Ed. Note.—For other cases, see Husband and Wife, Cent. Dig. § 1003; Dec. Dig. ☞272(1).]

4. EQUITY ☞39(1)—JURISDICTION—RETENTION OF JURISDICTION.

A court of equity, having jurisdiction of a suit by a divorced wife to recover her interest in the community property, will retain jurisdiction of the proceeding to do complete justice; other parties having intervened and set up their claims to such property, and the husband having died.

[Ed. Note.—For other cases, see Equity, Cent. Dig. §§ 104–109, 111, 114; Dec. Dig. ☞39(1).]

5. HUSBAND AND WIFE ☞272(5)—COMMUNITY PROPERTY—INTERESTS.

Where, to facilitate a divorce, a husband and wife made a settlement which for that reason was void, payments made by the husband under such settlement will be credited against the wife's share of the community estate, not against the whole property.

[Ed. Note.—For other cases, see Husband and Wife, Cent. Dig. § 1007; Dec. Dig. ☞272(5).]

6. HUSBAND AND WIFE ☞272(5)—COMMUNITY PROPERTY—PAYMENTS.

Where, after divorce, the property which had belonged to the community of the spouses was greatly enhanced in value by the efforts of the

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

husband, the husband is entitled to reasonable compensation for his services.

[Ed. Note.—For other cases, see Husband and Wife, Cent. Dig. § 1007; Dec. Dig. ⊘═272(5).]

7. HUSBAND AND WIFE ⊘═272(5)—COMMUNITY PROPERTY—COMPENSATION.

Where, after divorce, the husband retained control of the property which had been community, expenditures made by him in enhancing the value of the community should be allowed, in the suit by the wife to obtain her share.

[Ed. Note.—For other cases, see Husband and Wife, Cent. Dig. § 1007; Dec. Dig. ⊘═272(5).]

8. COSTS ⊘═59—APPORTIONMENT—EQUITIES.

In suit by a former wife to obtain her share in property which had composed the community estate of herself and her former husband, the costs of receivership proceedings will not be assessed wholly against the husband's interest, though the wife prevailed, where the equities were not all in her favor.

[Ed. Note.—For other cases, see Costs, Cent. Dig. §§ 261–276; Dec. Dig. ⊘═59.]

9. COURTS ⊘═363—STATE LAWS AS RULES OF DECISION—ADMINISTRATION OF ESTATES—PRIORITIES.

It is within the power of the state to determine the order in which debts of an estate shall be paid; therefore the federal courts must give effect to Rev. Laws Nev. § 6052, declaring priorities.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 939–949; Dec. Dig. ⊘═363.]

10. HUSBAND AND WIFE ⊘═276(5)—COMMUNITY PROPERTY—ADMINISTRATION—PRIORITIES OF CLAIMS.

Though a suit by a divorced wife to recover her share of the property which had composed the community of herself and her former husband was begun first, creditors of the husband, who died pending suit, cannot, having in his lifetime, and after institution of suit by wife, reduced their claims to judgment in the state court be deprived of the benefit of Rev. Laws Nev. § 6052, giving judgments rendered against deceased in his lifetime priority over ordinary demands.

[Ed. Note.—For other cases, see Husband and Wife, Cent. Dig. § 1037; Dec. Dig. ⊘═276(5).]

11. HUSBAND AND WIFE ⊘═276(5)—COMMUNITY PROPERTY—ADMINISTRATION—PRIORITIES OF CLAIMS—"DEBTS."

Rev. Laws Nev. § 6052, declares that the debts of the estate shall be paid: First, the funeral expenses; second, the expenses of the last sickness; third, debts preferred by federal laws; fourth, judgments rendered against the deceased in his lifetime; and, fifth, all other demands against the estate. A husband secured a divorce against his wife, and, there being no adjudication as to the rights of the former spouses with respect to the community property, the husband retained it and also converted to his own use the profits from such community estate. *Held*, that as the term "debt," used in the statute, signifies no more than a sum of money owing on a contract, express or implied, only the profits of the community estate converted by the husband can be deemed debts, but the husband must be treated as a trustee of the wife's interest in the community property, and as to such she takes priority over creditors who reduced their claims to judgment during the husband's lifetime, while as to the debt for the profits withheld she does not.

[Ed. Note.—For other cases, see Husband and Wife, Cent. Dig. § 1037; Dec. Dig. ⊘═276(5).

For other definitions, see Words and Phrases, First and Second Series, Debt.]

---

⊘═For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes.

12. COURTS ⊙═▷493(2)—FEDERAL COURTS—RESTRAINING ORDER—LIENS.

After an order of the federal court restraining disposition of property of defendant was served on a bank holding defendant's property, the bank cannot, by attachment in the state courts, acquire any lien.

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 1347; Dec. Dig. ⊙═▷493(2).]

13. WITNESSES ⊙═▷144(3)—COMPETENCY—TRANSACTIONS WITH DECEASED PARTIES.

Where one of the parties to a transaction was dead, a witness, who was really an adversary party to decedent, is incompetent to testify.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. § 628; Dec. Dig. ⊙═▷144(3).]

14. JUDGMENT ⊙═▷707—CONCLUSIVENESS—PERSONS NOT PARTIES.

One not a party to a judgment is not bound thereby.

[Ed. Note.—For other cases, see Judgment, Cent. Dig. § 1230; Dec. Dig. ⊙═▷707.]

15. HUSBAND AND WIFE ⊙═▷272(1)—COMMUNITY PROPERTY—AUTHORITY OF HUSBAND.

After divorce, the husband, who during the existence of the marriage could incumber and manage the community estate, has no further right to incumber the community property.

[Ed. Note.—For other cases, see Husband and Wife, Cent. Dig. § 1003; Dec. Dig. ⊙═▷272(1).]

16. HUSBAND AND WIFE ⊙═▷272(1)—COMMUNITY PROPERTY—INTERESTS OF WIFE—LIABILITY OF WIFE.

Before marriage, a husband, to protect community interests in a mining venture, executed a note on which he was personally liable. After divorce, the note was surrendered and the husband executed a new note. The wife was not a party to a judgment recovered by the holder of the notes against the husband. Held that, as the husband's right to bind the community estate ended with the dissolution of the marriage, and as the old note was surrendered and limitations against its enforcement had run before judgment was recovered on the second note, the wife's share of the community property, which was retained by the husband, was not subject to the payment of the second note, though her share of the community was once liable for satisfaction of the original.

[Ed. Note.—For other cases, see Husband and Wife, Cent. Dig. § 1003; Dec. Dig. ⊙═▷272(1).]

17. HUSBAND AND WIFE ⊙═▷272(5)—COMMUNITY PROPERTY—DISSOLUTION— EQUITABLE ESTOPPEL.

In such case, though the wife did not assert her rights in the community property for a number of years, yet as the bank, which held both notes, made no attempt to enforce the original note, and received no payments for a number of years, and then accepted the second note, surrendering the original, the wife was not estopped from asserting her rights in the community estate against the bank, for an estoppel cannot arise by reason of mere silence, there being nothing to show that the wife's delay misled the bank.

[Ed. Note.—For other cases, see Husband and Wife, Cent. Dig. § 1007; Dec. Dig. ⊙═▷272(5).]

18. ESTOPPEL ⊙═▷110—PLEADING—NECESSITY.

To be relied on, an equitable estoppel must be pleaded.

[Ed. Note.—For other cases, see Estoppel, Cent. Dig. § 300; Dec. Dig. ⊙═▷110.]

⊙═▷For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

19. HUSBAND AND WIFE ☞268(5)—COMMUNITY ESTATE—RIGHT OF HUSBAND
TO BIND.

A note, on which a husband became individually liable given to protect his interest in a mine, is a community obligation, enforceable against the community estate.

[Ed. Note.—For other cases, see Husband and Wife, Cent. Dig. § 961; Dec. Dig. ☞268(5).]

20. NOVATION ☞5—WHAT CONSTITUTES.

Where, before divorce, a husband signed a note to obtain funds to protect his interest in a mining venture, and after divorce, though no payments were made on the note for a number of years, it was surrendered and a new note received by the bank, the second note cannot be regarded as a renewal of the first as against the divorced wife's interest in the community estate, for at the time of execution of the second note the husband could not bind the community, as it no longer existed, and the wife did not consent to be bound by such obligation.

[Ed. Note.—For other cases, see Novation, Cent. Dig. § 5; Dec. Dig. ☞5.]

21. HUSBAND AND WIFE ☞272(1)—COMMUNITY PROPERTY—LIABILITY OF.

One who did not make loans to a husband until after divorce is not a community creditor.

[Ed. Note.—For other cases, see Husband and Wife, Cent. Dig. § 1003; Dec. Dig. ☞272(1).]

22. HUSBAND AND WIFE ☞272(5)—COMMUNITY PROPERTY—DISSOLUTION—
·EQUITABLE ESTOPPEL.

One who made loans to a husband, who was in possession of the entire community estate, after divorce, cannot assert any estoppel against the claim of the divorced wife to her share, where no misrepresentations were made by the wife, and the lender, from the facts in her possession, might have discovered the wife's right; it not appearing that the wife delayed asserting her rights to mislead the lender.

[Ed. Note.—For other cases, see Husband and Wife, Cent. Dig. § 1007; Dec. Dig. ☞272(5).]

23. RECEIVERS ☞65—PROCEEDINGS—EFFECT OF.

A receivership does not operate as an attachment or execution, but is no more than a sequestration of property for safe-keeping, leaving the question as to who is entitled thereto for subsequent determination.

[Ed. Note.—For other cases, see Receivers, Cent. Dig. §§ 114, 115; Dec. Dig. ☞65.]

24. RECEIVERS ☞65—APPOINTMENT—RIGHTS OF PARTIES SECURING.

One securing the appointment of a receiver to take possession of the property of defendant and an injunction against alienation does not for that reason obtain a lien or preference over other interested parties.

[Ed. Note.—For other cases, see Receivers, Cent. Dig. §§ 114, 115; Dec. Dig. ☞65.]

25. RECEIVERS ☞79—RECEIVERSHIP—EFFECT OF.

A divorced wife, seeking to assert rights in the property which had composed the community estate of herself and her former husband, secured the appointment of a receiver and an injunction against disposal. Thereafter creditors of the husband, in the state courts, reduced their claims against him to judgment before his death. After the death of the husband, the federal court in which suit was brought determined to distribute the estate. *Held* that, while ordinarily the existence of a receivership suspends the power of creditors to obtain any lien or advantage over other interested parties, yet as this rule does not apply to a receiver pendente lite, where the sole object is to preserve the property for the purpose of the decree as between the parties to the suit, those creditors who reduced their claims to judgment before the death of the hus-

band are entitled to that priority over ordinary debts given by Rev. Laws Nev. § 6052, notwithstanding the federal court subsequently decided to distribute the entire estate.

[Ed. Note.—For other cases, see Receivers, Cent. Dig. § 148; Dec. Dig. ⊕⇒79.]

In Equity. Bill by Roxa S. Johnson against William S. Johnson, in which J. T. Garner, as administrator with the will annexed of the estate of William S. Johnson, was substituted as defendant, the defendant dying pending trial, and in which the Tonopah Banking Corporation and another intervened. Decree for complainant, and adjudicating the rights of the interveners.

W. W. Griffin, of Carson City, Nev., and Sweeney & Morehouse, of Reno, Nev., for plaintiff.

Ayres & Gardiner, of Reno, Nev., for defendant.

George A. Bartlett, of Reno, Nev., for receiver.

Mack & Green, of Reno, Nev., for intervener Tonopah Banking Corp.

William Forman, of Tonopah, Nev., and George B. Thatcher, of Carson City, Nev., for intervener Smith.

FARRINGTON, District Judge. W. S. Johnson and Roxa S. Johnson became husband and wife in November, 1890. The only issue of the marriage is one son, Clemmer, now about 21 years of age. December 14, 1909, at Tonopah, Nev., the husband obtained a decree of divorce on the ground of desertion. August 8, 1913, Roxa Johnson brought the present suit in this court to recover her share of the community property; 10 days later a receiver was appointed, who was authorized to take charge, possession, and control of all the property of said W. S. Johnson and Roxa Johnson within this jurisdiction.

W. S. Johnson died March 27, 1914, and in the following month J. T. Garner was by an order and decree of the district court of the Seventh judicial district of the state of Nevada for Nye county, duly and regularly appointed administrator with the will annexed of the estate of said W. S. Johnson, deceased. Garner immediately qualified, and ever since has been, and now is, acting as such administrator.

1. It was decided April 6, 1914: First, that the agreement entered into between Mr. and Mrs. Johnson immediately prior to the divorce, in which he promised to pay her $3,000, and also $75 a month additional, pending the payment of the principal sum, was null and void, because it was made in contemplation of and to facilitate the divorce; second, that all property in Johnson's possession at the date of the decree was community property, and, under section 2166 of the Revised Laws of Nevada, should then have been divided equally between the two parties; third, that the divorced wife was not divested of her interest in such property by the failure of the state court to make such a division, or of the parties to ask it; and, fourth, that on the dissolution of the marriage, the title to the community property vested in Mr. and Mrs. Johnson as tenants in common. The correctness of the opinion then expressed as to the present interest of Mrs. Johnson has been challenged by counsel who have since appeared for intervening cred-

itors, in arguments so full and exhaustive as to merit a further expression of my views.

[1, 2] It is insisted that the decree of divorce, made without any disposition or mention of property, vested in Johnson all the property belonging to the parties at the time. Section 5841 of the Revised Laws of Nevada, on which this claim is based, in so far as it is material, is as follows:

"In granting a divorce, the court shall also make such disposition of the property of the parties as shall appear just and equitable * * * for the benefit of the children. And all property and pecuniary rights and interests, and all rights touching the children, their custody and guardianship, not otherwise disposed of or regulated by the order of the court, *shall, by such divorce, be divested out of the guilty party, and vested in the party at whose instance the divorce was granted.*"

The foregoing provision, adopted by the territorial Legislature in 1861, left the disposal of property very much to the discretion of the judge, without any controlling reference to the cause for which the divorce was granted, or to the character of the property; the main consideration apparently being the benefit of the children. In 1864 a Constitution was adopted for this state, which defined what should thereafter constitute the separate property of the wife, and also directed that laws should be passed more clearly defining the rights of the wife to the community, as well as to her separate property. Const. Nev. art. 4, § 31. Pursuant to this injunction "An act defining the rights of husband and wife" was adopted by our first Legislature. Stats. 1864–65, p. 239. This act was modeled after similar legislation in California, and contained the following provision, which is a literal and exact copy of the California original:

"Sec. 12. In case of the dissolution of the marriage by decree of any court of competent jurisdiction, the common property shall be equally divided between the parties and the court granting the decree shall make such order for the division of the common property, or the sale and equal distribution of the proceeds thereof, as the nature of the case may require: Provided, that when such decree of divorce is rendered on the ground of adultery, or extreme cruelty, the party found guilty thereof shall only be entitled to such portion of the common property as the court granting the decree may in its discretion, from the facts of the case, deem just and allow." Wood's Digest, p. 488, art. 2615.

No provision was made in the act for divorces granted without disposition of the property. In 1869 our Supreme Court decided the case of Howe v. Howe, 4 Nev. 469. In the pleadings nothing was said about property, but in granting a divorce for extreme cruelty, the lower court awarded all the property to the wife, at whose instance the divorce was granted. This was held error, because there was no basis for it in the pleadings. The cause was remanded, with leave to both parties to amend their pleadings.

Under this decision, it seems that the court, in the absence of appropriate allegations in the pleadings, is powerless to obey the statute, and make such disposition of the "property of the parties as shall appear just and equitable * * * for the benefit of the children." No explanation is offered by the court as to why that portion of the decree relating to property interests was not treated as surplusage, so

as to allow all the property to vest automatically in the wife, at whose instance the divorce was obtained, as provided in section 5841.

In 1873 the act of 1865 was repealed. Section 12, however, reappeared in the repealing act, with such changes as rendered more imperative the duty of the court to divide the property equally. The new provision reads as follows:

"In case of the dissolution of the marriage by decree of any court of competent jurisdiction, the community property must be equally divided between the parties, and the court granting the decree must make such order for the division of the community property, or the sale and equal distribution of the proceeds thereof, as the nature of the case may require." Stats. 1873, p. 195; Rev. L. § 2166.

The act of 1873 also contains this provision:

"Sec. 26. The property rights of husband and wife are governed by this act, unless there is a marriage contract or settlement containing stipulations contrary thereto." Revised L. § 2180.

It is worthy of note that the peculiar provisions of section 5841 are not found in this act. Prior to the adoption of the Constitution, property rights of husband and wife in Nevada were regulated, in the main, by the common law. In the act of 1861 there is no mention of community property; it had no legal existence in this state prior to the Constitution. The phrase "all property and pecuniary rights and interests" used in section 25 of the act of 1861 (Rev. L. § 5841), as quoted above, refers to property and property rights recognized by the common law at that time. As was said by the Supreme Court of Nevada in the case of Darrenberger v. Haupt, 10 Nev. 43:

"By the marriage, the legal existence of the wife is suspended or incorporated into that of the husband; she becomes sub potestate viri, is incapable of holding any personal property, or of having the use of any real estate; her earnings belong to her husband."

In the Darrenberger Case the property in controversy was a certificate of mining stock which had been purchased by the husband with the joint earnings of himself and his wife. She subsequently obtained a divorce. There being no disposal of the stock by the decree, the husband retained, and subsequently sold, it to Darrenberger. The wife based her action to recover the stock on the above-quoted section 5841. The court held, however, that inasmuch as the stock had been acquired before the adoption of the Constitution of this state, and prior to any Nevada legislation providing for separate or community property, the right to the stock must be governed by the common law, under which it belonged to the husband, and would remain with him, unaffected by the decree.

This conclusion seems utterly at variance with the requirement that "all property * * * not otherwise disposed of * * * by the order of the court, shall, by such divorce be divested out of the guilty party, and vested in the party at whose instance the divorce was granted" (section 5841), and is justified thus:

Section 27 of the same act declares:

"When the marriage shall be dissolved by the husband being sentenced to imprisonment, and when a divorce shall be ordered for the cause of adultery committed by the husband, the wife shall be entitled to the same proportion

of his lands and property as if he were dead; but in other cases the court shall set apart such portion for her support, and the support of their children, as shall be deemed just and equitable." Rev. L. § 5843.

These two sections, says the court—

"can be harmonized only upon the theory that the Legislature intended that in case of a divorce for the misconduct of the husband, other than imprisonment or adultery, his individual or sole property should be subject to the order of the court, under the provisions of section 27; and the court having made no order in respect to the property in question, it follows that the title and right of disposal of the same continued in the husband after, the same as before the divorce, and remained unaffected thereby."

It would seem under the Howe decision that the guilty spouse cannot be divested of his estate automatically by a decree of divorce which does not dispose of property, when the pleadings are silent as to such rights; and under the Darrenberger decision, the separate property of the husband is immune when the divorce is granted to the wife for any other cause than adultery or imprisonment for crime. Here we have an unreasonable discrimination against the wife. If section 25 of the act of 1861 (Rev. L. § 5841) is still in force, the guilty husband will retain his separate property as a matter of right, when a wife, divorced for a similar offense, will be automatically stripped of all her interests.

It is difficult to believe that the Legislature intended such a result. The language of section 12 of the act of 1873 is no less repugnant to section 25 of the act of 1861 than are the provisions of section 27 of the earlier act. In the act of 1873 the property rights of the husband and wife were clearly differentiated. It was declared that, save under exceptional circumstances, neither had any interest in the separate property of the other; that the property rights of both were to be regulated by that act; that the act of 1865, and all other acts and parts of acts in conflict therewith, were repealed; and in section 12 it declares that—

"in case of the dissolution of the marriage by decree of any court of competent jurisdiction, the community property must be equally divided."

The substitution of "must" for "shall," as used in the act of 1865, is significant. It is impossible to reconcile the mandatory language of the latter statute with the act of 1861, upon any theory that both are dealing with community property. When the act of 1861 was adopted, there was in Nevada no such thing as community property. The clear and positive direction of the act of 1873 is that the community property must be equally divided between the parties only when the divorce is rendered on the ground of adultery or extreme cruelty. There is here no intimation, and no language consistent with the idea, that the consequences of a failure by the court to order or regulate the distribution of property should be more serious than the consequences of adultery or extreme cruelty, and sufficient to divest the party against whom the divorce is granted, not merely of such portion of the community property "as the court  *  *  *  may, in its discretion, from the facts of the case, deem just" (as in case of adultery or extreme cruelty), but of the entire community property, as well as of "all property and pecuniary rights and interests."

Furthermore, we must not overlook the fact that, when the act of 1873 was adopted, the Supreme Court of California, under a similar, but less positive statute (Stats. Cal. 1857, p. 199), had declared in the case of De Godey v. Godey, 39 Cal. 157, that:

"If, in an action for divorce, the decree awarding it does not determine any disposition of the community property, and no such question be presented for decision by the pleadings, it will not conclude the parties, or either of them, in respect of their claims to such property."

It is certainly reasonable to infer that in the adoption of the California statute the Legislature of Nevada intended also to adopt the construction which had been already placed on it by the Supreme Court of California. The following authorities seem to be in line with De Godey v. Godey; Biggi v. Biggi, 98 Cal. 35, 32 Pac. 803, 35 Am. St. Rep. 141; Kirschner v. Dietrich, 110 Cal. 502, 42 Pac. 1064; Ambrose v. Moore, 46 Wash. 463, 90 Pac. 588, 11 L. R. A. (N. S.) 103; Hicks v. Hicks, 69 Wash. 627, 125 Pac. 945; Barkley v. Am. Sav. Bank & Trust Co., 61 Wash. 415, 112 Pac. 495; Tabler v. Peverill, 4 Cal. App. 671, 88 Pac. 994; Lake v. Bender, 18 Nev. 361, 371, 4 Pac. 711, 7 Pac. 74; Brown v. Brown, 170 Cal. 1, 147 Pac. 1168.

In Lake v. Bender, supra, plaintiff applied for a divorce and division of the community property. The issues relating to a divorce were tried by a jury. The jury's findings established plaintiff's right to a divorce, and were by order of the court approved. Thereafter there was a trial of the property rights by the court, without a jury. In holding that the district court had the power to grant a new trial of the issues relating to the property rights alone, the Supreme Court said, following the De Godey Case above:

"If plaintiff had filed her bill for divorce, prosecuted it to judgment in her favor, without any showing by either party of the existence of community property," she could thereafter have brought a second action to recover her share of such property.

[3] If said section 5841 were still in force, it would seem that a second action to determine property rights should be unnecessary. Mrs. Johnson, under the decision of October 29, 1913, which is now the law of this case, is entitled to one-half of the community property owned by herself and her husband at the time the divorce was rendered, December 14, 1909. The divorce terminated the community, as well as the marriage, and put an end to any right which either spouse may have had in or to the property of the other. Barrett v. Failing, 111 U. S. 523, 4 Sup. Ct. 598, 28 L. Ed. 505. Thereafter the interest of the former husband and wife in the property was that of tenants in common; they were not copartners; whatever in the nature of partnership may have inhered in the marital union was terminated by the divorce. Southwestern Mfg. Co. v. Swan (Tex. Civ. App.) 43 S. W. 813.

If Johnson disposed of any integral portion of this property, she is entitled to follow it, and to claim her share of such proceeds as can be clearly identified. She is also entitled to a moiety of the rents, issues and profits of the common property, and to an accounting. If Johnson converted her portion of such rents, issues, and profits to his

own use, she is entitled to a judgment therefor. I am unable to recede from the views expressed in my opinion of April 29, 1914. No effect can be given to section 5841 of the Revised Laws of Nevada. It is hopelessly at variance with the spirit, if not with the letter, of subsequent legislation on the same subject.

[4] II. January 18, 1915, a decision was rendered herein, directing that the Tonopah Banking Corporation, Ada Smith, and J. T. Garner, and the creditors of the estate of W. S. Johnson, be permitted to intervene. It was considered that this court, having acquired jurisdiction of the controversy between W. S. Johnson and Roxa Johnson, was bound to retain it in order to do complete justice in the premises. Johnson v. Johnson (D. C.) 225 Fed. 413.

The master in chancery, L. D. Summerfield, in his first report, finds that the following described property in the possession of W. S. Johnson at the date of his death was either a part of the community property at that time, or was acquired with the proceeds of community property then held:

5,000 shares of the capital stock of the Summerfield-Johnson Company, valued at $7,500.

An option to purchase 27,500 shares of the capital stock of the Nye County Land & Live Stock Company, recently sold to J. B. Humphrey for $16,500.

A diamond ring, diamond stud, and a watch, valued at $1,365.

Mining stock in various companies, of no substantial value; and

A business known as the "Big Casino," at Tonopah, Nye county, Nev.

No exceptions have been taken to this report, except by Mrs. Johnson, and these she has withdrawn. The master in his second report, filed November 5, 1914, finds the amount due from the estate to Mrs. Johnson, on an accounting for her half of the rents, issues, and profits of the common property, between December 14, 1909, the date of the divorce, and August 18, 1913, the date when the receiver took charge, to be $20,173.72.

November 4, 1914, defendant Garner filed his exceptions, in which intervening creditors Tonopah Banking Corporation, Ada Smith, George W. Summerfield, and George Wingfield joined April 3, 1916. The master declined to allow anything for Johnson's services between the divorce and the receivership. The report shows that the net income of the Big Casino business during this period was $450 per month. Under the receivership there were no profits; the disbursements consumed the income, and in November, 1913, the business itself was entirely lost. The compensation of the receiver, his attorneys, and several of the employés, as well as other expenses, amounting to more than $3,000, all told, must be paid, not out of the income of the business, but out of the estate itself.

[5] In his report the master credits Johnson with payments on the contract of December 14, 1909, made in contemplation of the divorce, amounting to but $1,175. The production by Johnson's attorneys within the past two weeks of canceled checks and other vouchers, showing that Johnson should have been credited with $2,647.50 instead of $1,175, removes an unpleasant impression which intruded into these proceedings at the very outset. The sum so received by Mrs.

Johnson should be charged, not against the common fund, but against her share of the profits.

[6] These facts, taken in connection with the large increase in the property accomplished under Johnson's management, lead me to conclude it is no more than just to allow for his services $250 per month for 44 months.

[7] During the time he was the sole owner of the option to purchase all the stock of the Nye County Land & Live Stock Company, Johnson expended $1,212.05 for an automobile, $460.98 for auto repairs, and $37.37 for a carpet, making a total of $1,710.73. These expenditures were for the ranch, and served to enhance the value of Johnson's interest in the property and in the option, and therefore should be allowed.

[8] Mrs. Johnson has prevailed in the suit, but the equities otherwise are not so uneven as to require the expenses and losses of the receivership to be cast on the Johnson estate. These, therefore, as well as the clerk's, master's, and stenographers' fees and charges, will be paid out of the common funds. Mrs. Johnson will be allowed $300 for costs.

Mrs. Johnson's claim against the estate of W. S. Johnson, deceased, will therefore be allowed for $11,758.36.

[9, 10] III. The fact that Mrs. Johnson commenced proceedings to recover her share of the property, and for an accounting against Johnson, before Ada Smith and the Tonopah Banking Corporation took action to enforce their claims, is not sufficient to justify this court in disregarding the statute which gives to judgments obtained against a decedent during his lifetime a preference over general demands against the estate. It is within the power of the state to determine and fix the order in which debts of an estate shall be paid, and the order so fixed is binding on this court and in this proceeding. Yonley v. Lavender, 21 Wall. 276, 22 L. Ed. 536; Dodd v. Ghiselin (C. C.) 27 Fed. 405.

Section 6052 of the Revised Laws of Nevada declares that:

"The debts of the estate shall be paid in the following order: First—Funeral expenses. Second—The expenses of the last sickness. Third—Debts having preference by the laws of the United States. Fourth—Judgments rendered against the deceased in his lifetime, and mortgages in order of their date. Fifth—All other demands against the estate."

[11] The term "debt," as used in the statute, signifies no more than a sum of money owing on a contract, express or implied. 8 Am. & Eng. Ency. L. 984; 13 Cyc. 393; 3 Blackstone's Commentaries, 154; Melvin v. State, 121 Cal. 16, 53 Pac. 416, 419.

"If goods, money, or securities belonging to another person lie amongst the goods of the deceased, capable of identification, and they come altogether to the hands of the personal representative, such other person's things are not to be reckoned among assets of the estate. Nor is money collected by an attorney, factor, or agent, and kept distinct and unmixed with the rest of his property. So property held by a trustee or fiduciary officer is not assets in the hands of his executors, administrators, or assignees. * * * Only those things in which the decedent had a beneficial interest at his death are assets, and not those which he holds in trust or as the agent, bailee, or factor of another." 2 Schouler on Wills, Executors and Administrators, § 1205.

In 18 Cyc. it is said at page 193:

"Property which a decedent held in a fiduciary capacity, does not at his death properly constitute assets, but should be devoted to the purposes of the trust, although the account of the trust should be settled by the personal representative! But if any trust fund which the decedent held in his lifetime be gone, or its identity lost at his death, the personal representative does not stand in the relation of trustee to the cestui que trust, beyond the obligation imposed by his office as executor or administrator; and no remedy lies against him except such as belongs to a general creditor of the estate, unless assets exist to which the lien of the cestui que trust in equity can properly attach."

At page 553:

"Property held in trust does not on the trustee's death become assets of his estate, but, although mingled with the trustee's own funds or used by him in the purchase of property for his own benefit, may, if it can be traced, be followed and reclaimed by the cestui que trust in the hands of the decedent's personal representative, regardless of the claims of the decedent's creditors; but where the trust funds were wasted by the trustee or can no longer be traced, the cestui que trust can claim only as a general creditor of the estate unless some statute entitles him to a preference."

To the same effect, see Woerner on American Law of Administration, §§ 305, 312; Hubbard v. Alamo Irrigating & Mfg. Co., 53 Kan. 637, 36 Pac. 1053, 1055, 37 Pac. 625; 18 Cyc. p. 417.

The claim of Mrs. Johnson may be resolved into two parts: First, there is a demand for one-half of the community property; and, second, there is a demand for one-half of the rents, issues, and profits received by Johnson from such property. The first is a claim for a half interest in specific things which have been identified. That which is claimed constitutes no part of the assets of the estate of W. S. Johnson. The second is a demand for moneys due Mrs. Johnson, which Johnson received and converted to his own use. The moneys are not identified, nor have or can they be traced into any specific property now constituting a part of the estate. They cannot be found, and, if paid, it must be out of Johnson's share of the common property. There was an obligation on Johnson to turn over to Mrs. Johnson a half interest in certain specific property, and another obligation to pay her a certain sum of money. The first obligation was not, but the second was and is, a debt within the meaning of the statute quoted.

IV. *Claim of the Tonopah Banking Corporation* for $3,347.46, with interest thereon at the rate of 1 per cent. per month from December 24, 1913, until paid, costs taxed at $44.25, and attorney's fees fixed at $700.

This obligation was incurred by Johnson as joint maker with the Manhattan Gold Crater Mining Company of a promissory note for moneys advanced and loaned by the banking corporation to the mining company. In 1907 the Manhattan Gold Crater Mining Company was indebted to the Tonopah Banking Corporation between $8,000 and $9,000. The bank demanded payment. At that time the directors and principal stockholders of the mining company were: L. L. Mushett, president; W. S. Johnson, vice president; George W. Summerfield, secretary-treasurer; R. C. Moore and Jacob Hoffman. Mushett testifies that he paid $5,000 of this indebtedness for himself and Moore.

A promissory note for the balance, $3,347.46, was executed by the mining company to the bank, and signed by W. S. Johnson. Later Mushett turned his claim for $5,000 over to an associate, named Whittenberg, who brought an action thereon, and took over all the property of the Gold Crater Mining Company on execution, for the benefit of himself and Mushett. Mushett was unable to say when the Whittenberg action was brought. He testifies that he talked with W. S. Johnson about reorganizing the mining company and taking up the indebtedness; but he could not seem to do much with Johnson, who was drinking heavily.

September 29, 1910, the note of 1907 was surrendered by the banking corporation, and probably destroyed. On the same day a new note for $3,347.46 was executed in favor of the banking corporation by the mining company, L. L. Mushett, president, and signed by Johnson. December 24, 1913, a default judgment on the second note was entered in the district court of the Second judicial district for Washoe county against the mining company and W. S. Johnson. The debt was the debt of the mining company. The signature of W. S. Johnson was attached to the first note while he and Roxa Johnson were husband and wife. The second note was executed more than nine months after Roxa Johnson and W. S. Johnson were divorced.

For the following reasons the bank now contends that its judgment must be paid in preference to all other claims against the estate, save funeral expenses, expenses of the last sickness, and moneys due the United States government: (1) It is a judgment against the deceased, secured by an attachment lien. (2) The judgment was based on a debt contracted by Johnson more than two years prior to the divorce. (3) Under section 5841 of the Revised Laws of Nevada, a divorce having been granted, without any attempt in the decree to dispose of or regulate the same, all property and pecuniary rights and interests are divested out of the guilty party, Mrs. Johnson, and vested in the party at whose instance the divorce was granted. (4) Being a judgment obtained against Johnson during his lifetime, under section 5062 of the Revised Laws of Nevada, it must be paid in preference to any judgment obtained after his death. It is also suggested that by delaying this suit 44 months Mrs. Johnson is now estopped to claim that the common property is other than the sole property of Johnson.

[12] (1) On the day this suit was brought a restraining order was issued out of this court, which contained the following provisions:

"It is further ordered that you, the said defendant William S. Johnson, and all your servants, counselors, attorneys, solicitors, and agents, and all others acting in aid or assistance of you and each and every of you, do absolutely desist and refrain from withdrawing from deposit, or in any way or manner transferring, incumbering, hypothecating, selling, disposing of, concealing, or disturbing the status quo of any moneys or property belonging to said defendant William S. Johnson, particularly 27,498 shares, or thereabouts, of the capital stock of the Nye County Land & Live Stock Company, a corporation, and 4,950 shares of the capital stock of the Summerfield-Johnson Company, a corporation, whether issued to, or held in the name or to the credit of, said William S. Johnson, or in the name of any other person for defendant's use or benefit, or in any capacity whatsoever, or deposited to his credit, or in the possession or under the control of said Tonopah Banking Corporation of Tonopah, Nevada."

233 F.—49

Three days later a copy of this restraining order was served by the marshal of this court on E. Howell, as cashier of the said Tonopah Banking Corporation. On the 10th day of October following, the banking corporation commenced its action in the district court for Washoe county on the note, *and, notwithstanding the restraining order, caused a writ of attachment to be issued,* which four days later was served on the banking corporation itself. The said Howell, as cashier, in his written return to the writ, stated:

"There is held in this bank 29,995 shares of stock of the Nye County Land & Live Stock Company, and that said shares are in the name of the Tonopah Banking Corporation, and this is to certify that, after defendant W. S. Johnson pays the said Tonopah Banking Corporation, also the Nixon National Bank of Reno, or the Nixon estate, the sum of $19,000, or thereabouts, with interest belonging and accruing thereto, thereupon the 29,995 shares aforesaid will then be handed and given to the said W. S. Johnson, providing that any legal action in the United States court does not order otherwise."

This writ of attachment was also levied on certain mining claims and improvements in Manhattan mining district, Nye county, Nev., belonging to the Manhattan Gold Crater Mining Company. The sheriff, in his return attached to said writ, certifies:

"That L. L. Mushett, being informed of the facts above set down, stated that he personally was the true and rightful owner of any and all improvements and personal property situate on the above-described real estate, and that he, the said *L. L. Mushett, with other persons, are now, and for some time past have been, in possession of said real estate under lease* from said Manhattan Gold Crater Mining Company."

There is no evidence that Johnson ever authorized the banking corporation to hold the stock of the Nye County Land & Live Stock Company as security for the payment of either of the above-mentioned notes; and in view of the receivership proceedings, and of the restraining order served on the banking corporation, I am unable to find that the bank acquired any lien by the attempted attachment of the stock of the Nye County Land & Live Stock Company.

[13] (2) The testimony of Mrs. Coulter, F. M. Lee, and R. C. Moore, in my opinion, is sufficient to establish the existence of the note of 1907, and its execution by the Manhattan Gold Crater Mining Company, L. L. Mushett, president, and W. S. Johnson. While Mushett is not a party to this action, it is not absolutely clear that he has no interest in the result of the intervention of the banking corporation. His statement to the sheriff, quoted above, and his testimony, indicate that the banking corporation attached the property of the Manhattan Gold Crater Mining Company before any action was commenced to recover the $5,000 which he advanced for the mining company on its obligation to the banking corporation. What, if any, arrangement was had with reference to this attachment is not disclosed. He was a party to the transaction, and in view of his willingness to allow the losses of the mining venture to fall on Johnson and the Johnson estate, I think he may be regarded as the other party to the transaction as against Johnson, and, as Johnson is dead and unable to testify, I shall not consider Mushett's testimony.

(3) The third contention, in so far as it involves section 5841 of the Revised Laws of Nevada, has been considered above at page 762 et seq.

[14–19] (4) Assuming the existence of the marriage; the execution of the first note in October, 1907; the dissolution of the marriage in December, 1909; the surrender and destruction of the first note and the execution of a second note for the same amount by the mining company and Johnson in 1910, while Johnson was in possession of all the common property of himself and Mrs. Johnson; the commencement of Mrs. Johnson's suit in August, 1913; the injunction, followed 10 days later by the receivership; the commencement of an action by the banking corporation in October, 1913, against the mining company and Johnson, followed immediately by attachment of the company's property, and an attempt to attach the property interests of Johnson in the custody of the bank; the entry of default judgment against the mining company and Johnson: Does it necessarily follow that the judgment in favor of the banking corporation must be paid out of the Johnson property before it is divided between Roxa Johnson and the Johnson estate?

Inasmuch as Mrs. Johnson was not joined in the action brought by the banking corporation against Johnson and the mining company, and was not at the time Johnson's wife, she is not bound by the judgment. The marriage relation had been terminated when the second note was executed in 1910; Johnson's signature thereto could not, as against Mrs. Johnson, create any new or additional obligations or liability. Prior to the divorce Johnson could incur debts for which the community would be liable, and incumber the community property; this power, however, ended with the dissolution of the marriage. Gentry v. Collins, 1 Posey Unrep. Cas. (Tex.) 721, 724; Jackson v. Stone (Tex. Civ. App.) 155 S. W. 960; Latour v. Latour, 134 La. 342, 64 South. 133. In Hart v. Foley, 1 Rob. (La.) 378, 381, the Supreme Court of Louisiana held that:

"After the death of one of the spouses, the community, in a legal sense of the word, is terminated; each party is seised of one undivided half of the property, subject to the payment of the debts. The creditor, who wishes to hold the heirs of the wife responsible for a community debt, must join them in his suit against the husband, for the latter no longer represents the community, which is at an end."

In Grandjean v. Runke (Tex. Civ. App.) 39 S. W. 945, there was a promissory note executed during coverture by a husband. After a decree of divorce had been entered, he promised in writing to pay the note. Shortly after, and just prior to the expiration of the time fixed by the statute of limitations, the holder of the note brought an action thereon.

"The note having been made during appellant's marriage, the community property of herself and husband not exempt from execution was liable for its payment. Upon the dissolution of the marriage, she became jointly liable with her divorced husband for its satisfaction, to the extent of the community property received by her. But, when the marriage was dissolved, the husband could not bind her or her interest in the community estate by contracting for an extension of the time for the payment of the note; yet, while such contract did not affect appellant, it did not relieve her, or her property re-

ceived from the community, from liability for such indebtedness, for the note, as to her, remained as originally made, and, four years not having elapsed from the time it became due until suit was filed, appellee's cause of action was not barred."

There is nothing in evidence showing that the first note did not become due in October, 1907, immediately after its execution, and that Mrs. Johnson's liability thereon, if any, was not barred by the statute in October, 1913. The banking corporation did not attempt to intervene in this proceeding, or to urge any claim against Mrs. Johnson, until November, 1914. Though it has been asserted repeatedly in the briefs that the banking corporation knew nothing of the decree of divorce, or of the claims of Mrs. Johnson, until it discovered what was going on in the federal court, nothing to that effect, either in the pleadings or evidence, has been called to my attention. Neither is it alleged nor shown that Mrs. Johnson had any knowledge of this intervener's claim, or that she made any statement, or performed any affirmative act, by which intervener was misled to its prejudice, or creditors were induced to trust Johnson.

The alleged fraud and perjury perpetrated in procuring the decree of divorce was not directed against, nor did it influence the conduct of, the banking corporation. While Mrs. Johnson may have slept on her rights from the date of divorce until the date of this suit, it does not appear, either in the pleadings or evidence, that this induced the bank to exact a new note from Johnson in 1910, to surrender the 1907 note, or to neglect its prior attachment on the property of the Manhattan Gold Crater Mining Company. The original note was given nearly six years before the banking corporation commenced its action against Johnson in the state court. During that period, so far as the evidence shows, Johnson never paid one cent, either of principal or interest. While it is possible this forbearance was occasioned by the failure of Mrs. Johnson to assert her claims, it would tax the most robust credulity to the breaking point to believe it. Banking institutions do not do business in that way, even with their best and most responsible clients.

Finally, if the bank had retained the note of October 19, 1907, and brought an action thereon against Mrs. Johnson, as well as Johnson, October 10, 1913, when its action against Johnson was commenced in the state court, doubtless it could have held Mrs. Johnson to the extent of her interest in the property. To be available, an estoppel must be specifically pleaded. 8 Standard Ency. of Procedure, 683, 686; Hanson v. Chiatovich, 13 Nev. 395.

It must be conceded that Mrs. Johnson neglected for 44 months to bring her suit; during that time Johnson was in sole possession of all the common property, and treated it as his own. This alone, however, is not sufficient to constitute an estoppel. It must further appear that Mrs. Johnson knew, or ought to have known, that others, relying on Johnson's apparent ownership, were so dealing with him as to alter their previous condition to their injury. Johnson was doing a profitable business. It is not alleged or shown that Mrs. Johnson knew that he had signed a note for the Manhattan Gold Crater Mining

Company, or that on the faith of his ownership of what was common property the 1907 note was surrendered, and the 1910 note taken in lieu thereof. Mere silence does not constitute an estoppel. Furthermore, one who seeks to avail himself of an estoppel must not only plead misleading representations or conduct, and reliance thereon, followed by consequent injury to himself, but he must also show that he was ignorant of the truth, and in the exercise of good faith and due diligence. Gardner v. Pierce, 22 Nev. 146, 154, 36 Pac. 782; De Berry v. Wheeler, 128 Mo. 84, 30 S. W. 338, 49 Am. St. Rep. 538, 540; McAdow v. Hassard, 58 Kan. 171, 48 Pac. 846; Bennet v. Strait, 63 Iowa, 620, 19 N. W. 806; Smith v. Gott, 51 W. Va. 141, 41 S. E. 175, 177; Coolidge v. Austin, 22 Cal. App. 334, 134 Pac. 357.

Originally the banking corporation advanced money to the mining company at the request of Mushett and Johnson. It is conceded that the note of 1907 novated the prior contract. It was a written promise to pay, executed by two of the three original obligors. The failure of Mushett to sign this note, and the payment by him of $5,000, unquestionably effected his release. The first note was executed by Johnson during the existence of the marriage, and while Johnson was a large stockholder in the mining company; it was undoubtedly given to protect a community interest in the mine, and was therefore a community obligation, and enforceable against the community property. Horton v. Donohoe-Kelly Banking Co., 15 Wash. 399, 46 Pac. 409, 47 Pac. 435; Williams v. Hitchcock, 86 Wash. 536, 150 Pac. 1143, 1147; Stubblefield v. McAuliff, 20 Wash. 442, 55 Pac. 637.

[20] The note given in 1910 was executed after Johnson and wife were divorced. Intervener contends that the two notes were for the same debt, between the same parties, and hence constituted one and the same contract; in other words, the second did not operate as a novation of the first. This, however, cannot be conceded. When Johnson signed the first note, he was a husband; he signed as the legal representative of the community, and of his wife, to the extent of her interest in the community. When he signed the second note, there was no community; he was no longer a husband; he signed for himself, and not as the representative of Mrs. Johnson. The intervener voluntarily surrendered the first note, on which Mrs. Johnson was then clearly liable, and accepted in lieu thereof the second note, which she had not authorized, and which was not signed by her husband, because she was no longer a married woman. She was then liable jointly and severally with him on the first note to the extent of her share of the community property, and her liability continued until it was released, satisfied, or barred by the statute of limitations. When the marital relation was at an end, Johnson lost his authority to bind Mrs. Johnson, or her share of the property, by changing the terms of the note, or by giving a new note, or by extending the time for payment. She was in no sense a party to the second note, or liable thereon.

Under the evidence and the pleadings, I am unable to hold that Mrs. Johnson, as against the Tonopah Banking Corporation, is estopped from urging her demands.

V. *Claim of Ada Smith* on a judgment rendered August 27, 1913, in her favor for $5,340.22, with interest thereon at the rate of 7 per cent. per annum, and costs taxed at $11.70.

The intervener prays that this judgment be decreed to be a valid, prior, and subsisting claim against both the common and community property of W. S. Johnson and Roxa S. Johnson, and that it be paid out of the same in preference to any claim of Roxa Johnson. This prayer is based on the following contentions: (1) All the community property of W. S. Johnson and Roxa Johnson was, under section 5841 of the Revised Laws of Nevada, divested out of Roxa Johnson and vested in W. S. Johnson, at whose instance the divorce was granted. This contention has already been disposed of. (2) The moneys advanced by the intervener, for which the judgment was rendered, served in part at least to swell the common property of Johnson and Mrs. Johnson. (3) Mrs. Johnson, by her delay in asserting an interest in the Johnson property, is estopped. (4) Her judgment was obtained during the lifetime of W. S. Johnson, and therefore is a preferred claim.

[21] Moneys loaned by Ada Smith, and used by Johnson in the purchase of Belmont stock, or an interest in the Nye County Land & Live Stock Company, may have increased the property of Johnson, but they certainly could not have increased the common property owned by husband and wife at the time of the divorce, and before the loans were made; nor could they have increased the subsequent rents and profits issuing out of Mrs. Johnson's share of that property. There is nothing in the alleged use of the money loaned by Ada Smith which entitles her claim to precedence in order of payment. It is only reasonable to suppose that all moneys loaned to Johnson by his creditors, as well as the rents, issues, and profits due Mrs. Johnson, which were applied by Johnson to his own uses, increased the property in his hands. I do not understand that Ada Smith is attempting to set up a lien against any specific portion of the stock, or against any specific interest of the Johnson estate in the Nye County Land & Live Stock Company, and, as she did not become a creditor of Johnson until after the divorce, the obligation to her is not a community debt.

[22] Paragraph 14 of Ada Smith's petition contains the allegations on which the estoppel is asked, and is as follows:

"This intervener states: She first became acquainted with the said W. S. Johnson at or about the time the decree of divorce was made and entered. * * * That this intervener was then less than 20 years of age, that she was inexperienced in business matters, and that the said W. S. Johnson obtained her confidence, and she at all times, until the present action was commenced, believed that said W. S. Johnson was the sole owner of all the property claimed and controlled by him, which property is now in the custody of this court. That she was so induced to believe such to be the fact from the declaration to her by said W. S. Johnson, and by the general repute as to his ownership of the same, and by his exercising all the acts of ownership usually exercised by the true owner of property, and by the failure of said plaintiff, Roxa S. Johnson, to, by action or publicity, or otherwise, prior to the institution of this action, assert claim to the same. That this intervener, so believing and relying upon the sole ownership of said property to be in said

W. S. Johnson, and believing him to be solvent and responsible, loaned to him said sums aforesaid."

The only delay or failure of Mrs. Johnson to assert her claim to the property, by which Ada Smith could be aggrieved, is that which occurred subsequent to the divorce, and prior to the loans; delay following the loan could not in any way have influenced or induced her to make it. The complaint shows that all of Ada Smith's loans to Johnson, except one for $200, were made within 9 months after the divorce. It is not alleged that Mrs. Johnson made any representations or statements in relation to the property, to Ada Smith or to any one else, or that she knew, or ought to have known, that Ada Smith was doing any business with Johnson, or contemplated any loans to him, or even had any money to loan. In fact, there is nothing in the pleadings from which we may infer that Mrs. Johnson was aware of the existence of such a person as Ada Smith, or that she was in duty bound to inform Ada Smith of her interest in the property. Ada Smith knew of the divorce; she knew that Johnson was possessed of property, but she does not allege ignorance of facts from which she could have known that Johnson's estate was in part, if not altogether, community property. Ignorance of the law can avail her no more than is can avail Mrs. Johnson. It is not alleged, nor can it be inferred from any facts set out in the complaint, that Mrs. Johnson voluntarily placed her property in the possession of Johnson, or that it was suffered so to remain in order to give him credit, or to enable him to incur debts. It is impossible to draw, from the facts set out in the complaint or in evidence, any inference of fraudulent intent on Mrs. Johnson's part. It could be of no possible advantage to her that Johnson should enjoy a fictitious credit; she could have no further interest in the property which he might acquire, either with his own funds or with borrowed money, after the divorce.

In all this I am unable to find anything which is sufficient to support the plea of estoppel.

[23-25] VI. Mrs. Johnson is entitled to a decree for one-half the property described in the master's first report. Her claim for money due on accounting, however, must be regarded merely as a debt due from the estate. Its rank in order of payment is a matter of much controversy; for convenience, it will be considered with the judgments in favor of Ada Smith and the Tonopah Banking Corporation.

Mrs. Johnson commenced this suit August 8, 1913. Ada Smith began her action August 16, 1913, and obtained judgment by default on the 27th day of the same month. The Tonopah Banking Corporation commenced its action October 10, 1913, and judgment by default followed on the 24th day of the following December. The receivership dates from August 18, 1913. The original purpose of the receivership, and of the injunction which immediately preceded it, was to preserve the property of W. S. Johnson, and prevent any transfer or disposal which might render the suit fruitless. At that time Mrs. Johnson had no lien or security for the payment of moneys then or now due her. The same may be said of the demands of Ada Smith and the banking corporation.

The master's second report, in which he finds that Mrs. Johnson is entitled on accounting to certain moneys from the Johnson estate, was not made until long after the death of Johnson; consequently it cannot lift the indebtedness to her into a position of preference. The judgments cannot be treated as liens, because Johnson had no realty, except a few worthless mining claims, to which a judgment lien could attach, and his personal property passed into the custody of this court in the present suit before the judgments were rendered. A receivership does not operate as an attachment or an execution. It is no more than a general sequestration of property for safe-keeping, leaving the question as to who is entitled thereto for subsequent determination.

The injunction and receivership secured to Mrs. Johnson no lien or preference over other interested parties. High on Receivers (4th Ed.) § 5; Central Appalachian Co. v. Buchanan, 90 Fed. 454, 458, 33 C. C. A. 598: 23 Am. & Eng. Ency. L. 1043; 34 Cyc. 75. As a rule the existence of a receivership suspends the power of creditors to acquire any lien or advantage over other interested parties. Foster v. Field, 13 Okl. 230, 74 Pac. 190, 194; Barnett v. East Tenn. V. & G. Ry. Co. (Tenn. Ch. App.) 48 S. W. 817, 822; Attorney General v. Continental Life Ins. Co., 28 Hun (N. Y.) 360; Jackson v. Lahee, 114 Ill. 287, 2 N. E. 172; Besuden v. Besuden Co., 4 Ohio Dec. 144. In 34 Cyc. at page 199, it is said:

"One who has no lien when a receiver is appointed, although the mere right to acquire one may then exist, cannot proceed for that purpose by independent action after the appointment of the receiver, and gain a preference over other creditors, as in the case of the administration of insolvent's estates, in which creditors are entitled to pro rata and equitable distribution. The application of this rule depends upon the nature of the suit in which the receiver is appointed, and the rule has been held not to apply to a receiver pendente lite, where the sole object is to preserve the property for the purpose of the decree as between the parties to the suit only, without affecting the interests of third persons, as distinguished from a receivership for the general administration of assets as above mentioned."

The rule as indicated in the quotation has an exception into which the present case falls. In the beginning of this litigation there was no thought of settling Johnson's estate, or making an equitable distribution of his property. The order of appointment contained no direction to the receiver to give notice to creditors to file claims. The creditors were in no wise restricted in the prosecution of their demands, and it was not until January 18, 1915, more than 7 months after the death of Johnson, that it became apparent to this court that it must in this proceeding distribute the estate. The entry of the judgments in favor of Ada Smith and the banking corporation, followed by the death of Johnson, had then raised those debts from the fifth to the fourth class mentioned in section 6052 of the Revised Laws of Nevada, and preferred them to general demands. This preference, having once attached, was not displaced by the subsequent determination of this court to administer the estate.

These conclusions find abundant support in the following authorities: High on Receivers (4th Ed.) § 349; Cramer v. Iler, 63 Kan.

579, 66 Pac. 617; 23 Am. & Eng. Ency. L. 1043; Waggy v. Jane Lew Lumber Co., 69 W. Va. 666, 72 S. E. 778, 779; Ellicott v. U. S. Ins. Co., 7 Gill (Md.) 307; Moore v. Southern States L. & T. Co. (C. C.) 83 Fed. 399. In Ellicott v. U. S. Insurance Co., 7 Gill (Md.) 307, the court decided that a creditor who had obtained a judgment in a court of law during the pendency of proceedings in equity, in which a receiver had been appointed, acquired thereby a lien on the defendant's real property in the hands of the receiver, quite as good as if no receiver had been appointed. The opinion of the court shows the reason for so deciding was that the only object in granting the receivership was to provide for safe keeping of the property, and that other creditors were not restrained from attempting to establish their demands.

In Moore v. Southern States Land & Timber Co. (C. C.) 83 Fed. 399, the conditions were very similar to those in the case at bar, in this: After other creditors had obtained judgments against the defendant during the existence of the receivership, the court determined to enlarge the scope of the proceedings, and to make an equitable distribution of all property of the defendant. This change, however, in no wise disturbed the preference already established by the judgments, though, if the larger purpose had characterized the proceedings from their inception, no such advantage could have been acquired. The facts in the case were as follows: There was a suit to foreclose a mortgage on the property of an insolvent corporation; a receiver was appointed, and a decree pro confesso entered. Some time later there was an amended decree, in which the court indicated for the first time an intention to make an equitable distribution of the funds among all the creditors, and it then provided for notice to creditors to file their claims. During the time which intervened between the appointment and the amended decree, several creditors, not being restrained from bringing suits against the corporation, obtained judgments. The court held that the interveners who had thus obtained such judgments should have a lien on all the property and effects of the defendant not covered by the mortgage, and that their right to be paid out of the property of the debtor was paramount to that of other creditors.

The foregoing claims of the Tonopah Banking Corporation and Ada Smith are of equal rank, and will take precedence of the claim of Mrs. Johnson for moneys due her on accounting. They will be allowed as judgments obtained against the deceased during his lifetime, and as against his estate, but not as against the interest in the specific property awarded to Mrs. Johnson in the master's first report.

Let a judgment and decree be entered in accordance with the foregoing opinion.